IN THE SUPREME COURT OF NORTH CAROLINA

No. 390PA11-2

FILED 11 APRIL 2014

BEROTH OIL COMPANY, PAULA and KENNETH SMITH, BARBARA CLAPP, PAMELA MOORE CROCKETT, W.R. MOORE, N&G PROPERTIES, INC., and ELTON V. KOONCE

v.

NORTH CAROLINA DEPARTMENT OF TRANSPORTATION


On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 725 S.E.2d 651 (2012), affirming an order denying plaintiffs' motion for class certification entered on 20 May 2011 by Judge Lindsay R. Davis, Jr. in Superior Court, Forsyth County. Heard in the Supreme Court on 3 September 2013.

> *Hendrick Bryant Nerhood & Otis, LLP, by Matthew H. Bryant, Timothy Nerhood, T. Paul Hendrick, and Kenneth C. Otis III, for plaintiff-appellants.*

> *Roy Cooper, Attorney General, by Dahr Joseph Tanoury, Special Deputy Attorney General, and John F. Oates, Jr., Assistant Attorney General, for defendant-appellee North Carolina Department of Transportation.*


JACKSON, Justice.

In this appeal we consider whether the Court of Appeals erred by affirming the trial court's order denying plaintiffs' motion for class certification. We hold that analyzing the substantive merits of plaintiffs' inverse condemnation claim is improper at the class certification stage and therefore, the trial court and the Court of Appeals erred in doing so. We also conclude that because of the unique nature of

property, coupled with the large number of diverse tracts involved in this litigation, individual issues would predominate over common issues of law and fact in a trial on the merits. Accordingly, we affirm in part, vacate in part, and reverse in part the opinion of the Court of Appeals for the reasons stated below.

Pursuant to the Transportation Corridor Official Map Act ("the Map Act"), the North Carolina Department of Transportation ("NCDOT") recorded corridor maps with the Forsyth County Register of Deeds on 6 October 1997 and 26 November 2008 identifying transportation corridors for the construction of a highway project known as the Northern Beltway. *See* N.C.G.S. §§ 136-44.50 to -44.54 (2011). Approximately 2,387 parcels of land are listed as located within the Northern Beltway. Plaintiffs are owners of some of these properties. After the filing of a corridor map, the Map Act prohibits issuance of a building permit or approval of any subdivision plat for any property located within the transportation corridor. *Id.* § 136-44.51(a). However, owners of affected properties are not without recourse because these restrictions can be lifted three years after the submission of an application for a building permit or subdivision plat approval if, *inter alia*, efforts to acquire the property have not been initiated. *Id.* § 136-44.51(b). The Map Act also allows the granting of a variance exempting a landowner from these restrictions upon a showing that "no reasonable return may be earned from the land" and the restrictions "result in practical difficulties or unnecessary hardships." *Id.* § 136-44.52. Finally—through what is referred to as the "Hardship Program"—

the Map Act allows for "advanced acquisition of specific parcels of property when that acquisition is determined . . . to be in the best public interest to protect the transportation corridor from development or when the [corridor map] creates an undue hardship on the affected property owner." *Id.* § 136-44.53(a).

Plaintiffs' brief states that as of 22 March 2013, NCDOT had purchased over 454 properties in the Northern Beltway. Apparently, a large number of these properties were acquired even before the corridor maps were filed. Earlier, on 18 February 1999, a group of affected property owners filed a lawsuit in the United States District Court for the Middle District of North Carolina, which resulted in a court order issued in June 1999 barring "any irrevocable actions relating to construction, right-of-way acquisitions, or negotiations for right-of-way acquisitions, in furtherance of the [Northern Beltway]." *N.C. Alliance for Transp. Reform, Inc. v. USDOT*, 713 F. Supp. 2d 491, 499 (M.D.N.C. 2010). For the next eleven years, this federal order prevented NCDOT from taking any action as to any of the affected properties.[1] On 19 May 2010, the injunctive provisions in the court's order were lifted, *id.* at 513, and NCDOT resumed making advanced acquisitions. NCDOT has purchased at least six properties since then.

---

[1] While the court order was in effect, NCDOT was allowed to engage in limited acquisitions with the consent of the federal plaintiffs. *See N.C. Alliance for Transp. Reform*, 713 F. Supp. 2d at 503.

On 16 September 2010, plaintiffs filed a complaint and declaratory judgment action in Superior Court, Forsyth County, asserting five "claim[s] for relief": (1) inverse condemnation pursuant to N.C.G.S. § 136-111; (2) an unlawful taking in violation of the Fifth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; (3) denial of equal protection in violation of the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983; (4) a wrongful taking in violation of Article I, Section 19 of the North Carolina Constitution; and (5) a request for declaratory relief seeking a declaration of taking and the date of the taking, or, in the alternative, a declaration that the Hardship Program and the Map Act are unconstitutional in that "they [e]ffect a taking by the NCDOT without just compensation and are unequal in their application to property owners." Plaintiffs alleged that in the thirteen years since the department filed the corridor maps, NCDOT has not commenced any condemnation or eminent domain actions against them, but has acquired other property within the Northern Beltway through the Hardship Program. Plaintiffs alleged that NCDOT does not maintain its Northern Beltway property to the standards of other property owners and that it leases its property for less than fair market value, resulting in "condemnation blight" in the Northern Beltway. Plaintiffs further alleged that NCDOT intends to purchase plaintiffs' properties at some future date but no schedule for acquisition of property has been announced, and NCDOT has stated that no funds are available to begin acquisitions for the next ten years. Plaintiffs alleged that NCDOT's actions

have placed a "cloud" upon all real property in the Northern Beltway by "destroying and nullifying [the] properties' value," "substantially interfering with [all property owners'] elemental and constitutional rights growing out of the ownership of the properties," and "restricting [their] capacity to freely sell their properties," and that NCDOT's conduct constitutes a taking of their properties without just compensation.

Plaintiffs also sought class certification for themselves "and all others similarly situated who own property in the Northern Beltway in Forsyth County and are subject to [the Map Act]." Plaintiffs alleged that "[t]here are over 500 potential class members" who "have been deprived of their property rights" and whose property NCDOT "is obligated to purchase." Plaintiffs proposed a bifurcated trial in which the first phase would determine whether NCDOT is liable to the class, and the second phase would consist of individual trials to determine each property owner's individual damages. Plaintiffs filed a separate motion for class certification on 18 March 2011, alleging that "[t]here are no less tha[n] 800 class members" who "have had their property adversely impacted by the NCDOT's [m]aps, the [Map Act,] and the actions of the NCDOT" and who therefore "have an interest in the same issues of fact and law, and these issues predominate over issues affecting only individual class members."

NCDOT filed an answer and motion to dismiss plaintiffs' claims pursuant to Rules 12(b)(1), (2), and (6) of the North Carolina Rules of Civil Procedure, and raised the defense of sovereign immunity. The trial court granted NCDOT's motion to dismiss as to plaintiffs' second, third, and fourth claims, as well as the portion of plaintiffs' fifth claim seeking a declaration of taking and date of taking. The trial court denied NCDOT's motion to dismiss plaintiffs' first claim of inverse condemnation, and their fifth claim seeking a declaration of the Map Act as unconstitutional. Neither party has appealed from this order. The trial court heard plaintiffs' motion for class certification on 25 April 2011 and entered an order on 20 May 2011 denying class certification. Plaintiffs appealed, and the Court of Appeals affirmed the ruling of the trial court. *Beroth Oil Co. v. NCDOT*, ___ N.C. App. ___, 725 S.E.2d 651 (2012). We allowed plaintiffs' petition for discretionary review.

Rule 23 of the North Carolina Rules of Civil Procedure governs class actions. It states in pertinent part: "If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued." N.C.G.S. § 1A-1, Rule 23(a) (2011). "First, parties seeking to employ the class action procedure [pursuant to] our Rule 23 must establish the existence of a class." *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 282, 354 S.E.2d 459, 465 (1987). A "class" exists "when each of the members has an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only

individual class members." *Id.* at 277, 354 S.E.2d at 462. The party seeking to bring a class action also bears the burden of demonstrating the existence of other prerequisites:

> (1) the named representatives must establish that they will fairly and adequately represent the interests of all members of the class; (2) there must be no conflict of interest between the named representatives and members of the class; (3) the named representatives must have a genuine personal interest, not a mere technical interest, in the outcome of the case; (4) class representatives within this jurisdiction will adequately represent members outside the state; (5) class members are so numerous that it is impractical to bring them all before the court; and (6) adequate notice must be given to all members of the class.

*Faulkenbury v. Teachers' & State Emps.' Ret. Sys. of N.C.*, 345 N.C. 683, 697, 483 S.E.2d 422, 431 (1997) (citing *Crow*, 319 N.C. at 282-84, 354 S.E.2d at 465-66). When all the prerequisites are met, it is left to the trial court's discretion "whether a class action is superior to other available methods for the adjudication of th[e] controversy." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466.

> "Class actions should be permitted where they are likely to serve useful purposes such as preventing a multiplicity of suits or inconsistent results. The usefulness of the class action device must be balanced, however, against inefficiency or other drawbacks. . . . [T]he trial court has broad discretion in this regard and is not limited to consideration of matters expressly set forth in Rule 23 or in [*Crow*].

*Id.* "[T]he touchstone for appellate review of a Rule 23 order . . . is to honor the 'broad discretion' allowed the trial court in all matters pertaining to class certification." *Frost v. Mazda Motor of Am., Inc.*, 353 N.C. 188, 198, 540 S.E.2d 324,

331 (2000). Accordingly, we review the trial court's order denying class certification for abuse of discretion.[2] *See Faulkenbury*, 345 N.C. at 699, 483 S.E.2d at 432 (citing *Crow*, 319 N.C. at 284, 354 S.E.2d at 466). "[T]he test for abuse of discretion is whether a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision." *Frost*, 353 N.C. at 199, 540 S.E.2d at 331 (citations and quotation marks omitted).

This Court has not previously set forth the standard of review that we employ to review findings of fact and conclusions of law in a class certification order. The Court of Appeals' reasoning in a recent case is persuasive. *See Blitz v. Agean, Inc.*, 197 N.C. App. 296, 677 S.E.2d 1 (2009), *disc. rev. denied and cert. denied*, 363 N.C. 800, 690 S.E.2d 530 (2010). *Blitz* dealt with an alleged violation of 47 U.S.C. § 227 of the Telephone Consumer Protection Act. *Id.* at 298, 677 S.E.2d at 3. There the Court of Appeals relied upon precedent from this Court, precedent from the United States Court of Appeals for the Second Circuit, and its own cases in

---

[2] In *Crow* we stated, "Whether a proper 'class' under Rule 23(a) *has been alleged* is a question of law." 319 N.C. at 280, 354 S.E.2d at 464 (emphasis added). There we reviewed the trial court's judgment on the pleadings, not a class certification order. *Id.* at 280-81, 354 S.E.2d at 464. Accordingly, the issue before the Court was "whether the allegations of the complaint, taken as true and viewed in the light most favorable to the plaintiffs, support[ed] the conclusion that the named and unnamed plaintiffs comprise[d] a 'class' within the meaning of Rule 23(a)." *Id.* at 281, 354 S.E.2d at 464. After holding as a matter of law that the plaintiffs had properly *alleged* the existence of a class, we remanded the case to the trial court to determine whether the plaintiffs "established *to the satisfaction of the trial court* the *actual existence* of a class." *Id.* at 282, 354 S.E.2d at 465 (emphases added). Therefore, we review the trial court's determination of whether plaintiffs established the actual existence of a class for abuse of discretion.

developing the appropriate standard of review. *Id.* at 299-301, 677 S.E.2d at 4-5. As the court in *Blitz* noted, reviewing de novo the trial court's conclusions of law is "in accord with North Carolina precedent involving matters of law decided in cases where the general standard of review is abuse of discretion." *Id.* at 300, 677 S.E.2d at 4 (citing *Edwards v. Wall*, 142 N.C. App. 111, 114-15, 542 S.E.2d 258, 262 (2001) (expert qualification); *Kinsey v. Spann*, 139 N.C. App. 370, 372, 533 S.E.2d 487, 490 (2000) (motion for new trial)); *see also LendingTree, LLC v. Anderson*, ___ N.C. App. ___, ___, 747 S.E.2d 292, 296 (2013) (venue selection). With regard to factual matters, the Court of Appeals in *Blitz* relied upon its own precedent, stating that an " 'appellate court is bound by the [trial] court's findings of fact if they are supported by competent evidence.' " 197 N.C. App. at 300-01, 677 S.E.2d at 4 (alteration in original) (quoting *Nobles v. First Carolina Commc'ns, Inc.*, 108 N.C. App. 127, 132, 423 S.E.2d 312, 315 (1992), *disc. rev. denied*, 333 N.C. 463, 427 S.E.2d 623 (1993)); *see also Peverall v. Cnty. of Alamance*, 184 N.C. App. 88, 92, 645 S.E.2d 416, 419 (2007) (same).[3] In sum, findings of fact are binding if supported by competent evidence, and conclusions of law are reviewed de novo.

---

[3] We note that some federal courts review the trial court's factual findings for clear error, a standard of review that is more deferential to the trial court. *See, e.g.*, *In re Countrywide Fin. Corp.*, 708 F.3d 704, 707 (6th Cir. 2013); *Meyer v. Portfolio Recovery Assocs.*, 707 F.3d 1036, 1040 (9th Cir. 2012), *cert. denied*, ___ U.S. ___, 185 L. Ed. 2d 1068 (2013); *In re New Motor Vehicles*, 522 F.3d 6, 17 (1st Cir. 2008); *In re Initial Pub. Offerings*, 471 F.3d 24, 40-41 (2d Cir. 2006); *Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006); *Wilkins v. Univ. of Houston*, 695 F.2d 134, 135 (5th Cir. 1983); *Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 36 (4th Cir. 1978) (per curiam). The different standard of review for federal cases applies because Rule 52(a) of the Federal Rules of Civil

Here the trial court found that although plaintiffs satisfied the other prerequisites, plaintiffs failed to establish the existence of a class. The trial court engaged in an analysis of plaintiffs' takings claim, noting that "[w]hen no seizure is involved, whether a taking has occurred depends on whether the mechanism alleged has caused substantial impairment in value of the subject property." The trial court explained that this Court has applied the "substantial impairment" test to hold that a taking has occurred in various circumstances, such as a "continuous and blinding glare" caused by a silver water tower; frequent overflights near an airport; odors from a trash dump; and odors, smoke, ashes, rats, and mosquitoes from a sewage disposal plant. The trial court determined, however, that those cases "represent physical invasions, by sound waves in the case of overflights, and by the particles carried in the air which result in odor and smoke, and the invasion of winged and four-legged vermin, in the case of sewage plants." Therefore, the trial court reasoned that those cases were "distinguishable from cases of 'regulatory takings,' in which some law or ordinance affects the use to which property can be put without entry of any nature."

The trial court explained that "when in the exercise of the police power, a legislative act imposes restrictions on the use of property alleged to constitute a

Procedure specifically states that the appellate court will not set aside a trial court's findings of fact unless the higher court determines that the findings are "clearly erroneous." *See* Fed. R. Civ. P. 52(a)(6). Because our own Rule 52 does not include a similar requirement, *see* N.C.G.S. § 1A-1, Rule 52 (2013), we decline to adopt this more deferential standard of review.

taking," a two-part inquiry called the "ends-means" test is required. First, the court must determine "whether the exercise of police power is legitimate, that is, whether 'the ends sought . . . [are] within the scope of the power, and . . . whether the means chosen to regulate are reasonable.' " Second, the court must determine "whether the interference with the owner's rights amounts to a taking." Acknowledging that the Map Act "contains no expression of its purpose," the trial court noted that at least one purpose is to protect the public purse by limiting the development of properties so that NCDOT would not have to pay as much for future acquisitions. The trial court concluded that protecting the public purse is a "valid reason for exercising police power," but stated that "[i]t is another question, however, whether such restrictions are 'reasonable.' " Assuming that they are reasonable restrictions, the trial court explained that "the second inquiry, whether the interference with the owner's rights amounts to a taking, depends on whether the interference renders the use of the property impractical and the property itself of no reasonable value." The trial court noted that this determination would have to be made with respect to each individual property "because each property is different." Therefore, the court concluded that "[c]ommon issues of fact and law would not predominate" and that therefore plaintiffs "have not defined a 'class.' " Further, even assuming that plaintiffs did define a class, the trial court determined that a class action was not a superior procedure because "whether a taking has occurred must be determined on

a property-by-property basis" and therefore, "[n]one of the savings and expediencies that a class action offers would be realized."

Plaintiffs argue that the trial court erred by applying an ends-means analysis to their takings claim and assert that the court instead should have applied the traditional eminent domain analysis as to whether NCDOT's actions constituted a "substantial interference" with plaintiffs' property rights. Plaintiffs contend that "once there has been a determination of liability and date of taking for the class, [plaintiffs] foresee only the most difficult valuation cases possibly going to trial on damages." Plaintiffs' argument oversimplifies the issue of liability. Section 136-111 of our General Statutes provides:

> Any person whose land or compensable interest therein has been taken by an intentional or unintentional act or omission of [NCDOT] and no complaint and declaration of taking has been filed by [NCDOT] may . . . file a complaint in the superior court . . . alleg[ing] with particularity the facts which constitute said taking together with the dates that they allegedly occurred; said complaint shall describe the property allegedly owned by said parties and shall describe the area and interests allegedly taken.

N.C.G.S. § 136-111 (2011). To prevail on their inverse condemnation claim, plaintiffs must show that their "land or compensable interest therein has been taken." *Id.* In *Long v. City of Charlotte*, 306 N.C. 187, 293 S.E.2d 101 (1982), we stated:

> While North Carolina does not have an express constitutional provision against the "taking" or

"damaging" of private property for public use without payment of just compensation, this Court has allowed recovery for a taking on constitutional as well as common law principles. We recognize the fundamental right to just compensation as so grounded in natural law and justice that it is part of the fundamental law of this State, and imposes upon a governmental agency taking private property for public use a correlative duty to make just compensation to the owner of the property taken. This principle is considered in North Carolina as an integral part of "the law of the land" within the meaning of Article I, Section 19 of our State Constitution.

*Id.* at 195-96, 293 S.E.2d at 107-08 (footnote omitted). The term "property" not only refers to "the thing possessed," but also includes "every aspect of right and interest capable of being enjoyed as such upon which it is practicable to place a money value." *Id.* at 201, 293 S.E.2d at 110. It is clear that the goal of inverse condemnation here is relatively straightforward: to compensate at fair market value those property owners whose property interests have been taken by the development of the Northern Beltway. This goal is in keeping both with this Court's legal precedents and the statutory mandates of the Legislature. *See Long*, 306 N.C. at 201, 293 S.E.2d at 111 (stating that when a person's property has been taken, "he is entitled to recover to the extent of the diminution in his property's value"); *see also* N.C.G.S. § 136-111 (stating that if NCDOT admits to a taking of property, the department shall "deposit with the court the estimated amount of compensation for said taking"). Determining whether there has been a taking in the first place, however, is much more complicated.

The United States Supreme Court has recognized that a "nearly infinite variety of ways [exist] in which government actions or regulations can affect property interests." *Ark. Game & Fish Comm'n v. United States*, ___ U.S. ___, ___, 184 L. Ed. 2d 417, 426 (2012). In its simplest form, a taking always has been found in cases involving "a permanent physical occupation." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428, 73 L. Ed. 2d 868, 877 (1982). Short of a permanent physical intrusion, however, "no 'set formula' exist[s] to determine, in all cases, whether compensation is constitutionally due for a government restriction of property." *Id.* at 426, 73 L. Ed. 2d at 876 (quoting *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124, 57 L. Ed. 2d 631, 648 (1978)). As one commentator has noted, "the law of inverse condemnation is an untidy compilation of legal theories." Charles Szypszak, *Eminent Domain and Local Government in North Carolina: Law and Procedure* 127 (2008). Professor Szypszak quotes another commentator who observes that the case law in this area regarding "government liability for property damage is a 'shifting, puzzling pattern,' in which courts 'have interwoven the law of inverse condemnation with property and tort law concepts and with artificial interpretations of the eminent domain provisions.'" *Id.* (quoting Daniel R. Mandelker, *Inverse Condemnation: The Constitutional Limits of Public Responsibility*, 1966 Wis. L. Rev. 3, 3, 16). Identifying which legal principles apply will depend upon the facts of each particular inverse condemnation case. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224, 106, 89 L. Ed. 2d 166,

178-79 (1986) (noting that identifying a taking requires "ad hoc, factual inquiries into the circumstances of each particular case"); *Penn Cent.*, 438 U.S. at 124, 57 L. Ed. 2d at 648 (stating that deciding whether a taking has occurred involves "essentially ad hoc, factual inquiries"); *Barnes v. N.C. State Highway Comm'n*, 257 N.C. 507, 518-19, 126 S.E.2d 732, 740-41 (1962) (distinguishing cases cited by a party because "they involve different factual situations and different legal principles are applicable").

We agree with plaintiffs that there is a "distinction between the police power and the power of eminent domain." *See DOT v. Harkey*, 308 N.C. 148, 152, 301 S.E.2d 64, 67 (1983) (citing *Barnes*, 257 N.C. at 514-17, 126 S.E.2d at 737-39 ). In *Barnes* we explained:

> The question of what constitutes a taking is often interwoven with the question of whether a particular act is an exercise of the police power or of the power of eminent domain. If the act is a proper exercise of the police power, the constitutional provision that private property shall not be taken for public use, unless compensation is made, is not applicable. The state must compensate for property rights taken by eminent domain; damages resulting from the exercise of police power are noncompensable.

257 N.C. at 514, 126 S.E.2d at 737-38 (citations and quotation marks omitted). But we do not reach these questions in determining whether a class action is proper for this proceeding. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the

merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 40 L. Ed. 2d 732, 749 (1974).[4]  Here both the trial court and the Court of Appeals improperly engaged in a substantive analysis of plaintiffs' arguments with regard to the nature of NCDOT's actions and the impairment of their properties.[5]  *See Beroth Oil*, ___ N.C. App. at ___, 725 S.E.2d at 659-63.  We expressly disavow that portion of the Court of Appeals opinion stating that "[t]he trial court correctly relied upon the ends-means test in the instant case, as the alleged taking is regulatory in nature and as [the court] ha[s] specifically held this analysis applicable outside the context of zoning-based regulatory takings."  *Id.* at ___, 725 S.E.2d at 663.  As explained below, the unique nature of land combined with the diversity of the proposed class preclude any analysis of the merits of plaintiffs' takings claim when determining the issue of class certification in the case *sub judice*.

Here plaintiffs' proposed class includes over 800 property owners within the Northern Beltway.  Not all of these 800 property owners have the same property

---

[4] Although North Carolina's Rule 23 differs from Federal Rule 23, this Court has relied upon federal cases interpreting the federal rule for guidance.  *See Crow*, 319 N.C. at 282-84, 354 S.E.2d at 465-66.

[5] This does not mean that the trial court is precluded from *any* consideration of the merits at the class certification stage.  The United States Supreme Court has acknowledged that generally a class determination "involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469, 57 L. Ed. 2d 351, 358 (1978) (citation and internal quotation marks omitted).  Inquiry into the merits of the cause of action, however, should be made only to the extent necessary to determine whether the requirements of Rule 23 have been met.  *See Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 366 (4th Cir. 2004).

interests and expectations. As the trial court correctly noted, the properties within the Northern Beltway are diverse: "Some . . . are improved and some are not. Some are residential and others are commercial." We acknowledge that some property owners have suffered significant adverse effects as a result of the filing of the corridor maps and the long delay in any subsequent action by NCDOT. Nevertheless, plaintiffs have not shown that all 800 owners within the corridor are affected in the same way and to the same extent. *See Crow*, 319 N.C. at 282, 354 S.E.2d at 465 ("The party seeking to bring a class action under Rule 23(a) has the burden of showing that the prerequisites to utilizing the class action procedure are present." (footnote omitted)). While NCDOT's generalized actions may be common to all, the Court of Appeals correctly determined that "liability can be established only after extensive examination of the circumstances surrounding each of the affected properties." *Beroth Oil*, ___ N.C. App. at ___, 725 S.E.2d at 664. This discrete fact-specific inquiry is required because each individual parcel is uniquely affected by NCDOT's actions. The appraisal process contemplated in condemnation actions recognizes this uniqueness and allows the parties to present to the fact finder a comprehensive analysis of the value of the land subject to the condemnation. *See* N.C.G.S. § 136-112 (2011) (setting forth the measure of damages); *DOT v. M.M. Fowler, Inc.*, 361 N.C. 1, 13 n.5, 637 S.E.2d 885, 894 n.5 (2006) ("Methods of appraisal acceptable in determining fair market value include: (1) comparable sales, (2) capitalization of income, and (3) cost. While the

comparable sales method is the preferred approach, the next best method is capitalization of income when no comparable sales data are available." (citations omitted)); *Templeton v. State Highway Comm'n*, 254 N.C. 337, 339, 118 S.E.2d 918, 920 (1961) (allowing the admission of "[a]ny evidence which aids . . . in fixing a fair market value of the land and its diminution by the burden put upon it").

We generally agree with the separate opinion that differences in the amount of damages "will not preclude class certification so long as the takings issue predominates." *See Beroth Oil Co. v. NCDOT*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2014) (390PA11-2) (Newby, J., dissenting in part and concurring in part). Here, however, the takings issue is inextricably tied to the amount of damages; the extent of damages is not merely a collateral issue, but is determinative of the takings issue itself. *See Mattoon v. City of Norman, Okla.*, 1981 OK 92, ¶ 23, 633 P.2d 735, 740 (1981) (observing that "the individual questions and the common questions become so intertwined and interconnected as to make them impossible of separation and impossible to weigh for assessment of predominance").

As we have noted at some length, we believe that one of the trial court's fundamental errors was choosing to employ *any* test to determine the extent of damages suffered by all 800 landowners and whether a taking has occurred at this stage of the proceedings. The separate opinion misconstrues our reasoning, opining that the potential for utilization of different tests is an endorsement from this Court

that threatens to result in disparate treatment for the landowners. *See Beroth*, ___ N.C. at ___, ___ S.E.2d at ___ (Newby, J., dissenting in part and concurring in part). This is patently incorrect. Although the need *may* arise to use a *different* test in order to determine whether a taking has occurred, it also *may* be most appropriate to utilize the *same* test to determine the takings issue, depending upon the facts and circumstances of the subject property. While the separate opinion seeks to resolve this question today, we believe that reaching this question would be premature at this juncture. Accordingly, it is improper to remand this case to the trial court for such a determination.

Notwithstanding the assertion made by the separate opinion that "the majority's approach focuses exclusively on the unique nature of property, arguably promulgating a per se rule that will bar class actions for claims of inverse condemnation," *Id.* at ___, ___ S.E.2d at ___, we do not hold that class certification is never proper for an inverse condemnation claim. Both plaintiffs and the separate opinion cite inverse condemnation cases in which class certification has been allowed; however, in each of these cases the existence of a class was substantiated by narrowing the legal and factual issues involved. *See, e.g.*, *Loretto*, 458 U.S. at 432, 436-38, 73 L. Ed. 2d at 883-84 (noting the avoidance of "difficult line-drawing problems" and "relatively few problems of proof" in determining "whether there [has been] a taking in the first instance" where installation of cables was a permanent physical occupation); *Amen v. City of Dearborn*, 532 F.2d 554, 556 (6th Cir. 1976) (in

which the trial court divided the plaintiffs into six subclasses), *cert. denied*, 465 U.S. 1101, 80 L. Ed. 2d 127 (1984); *Foster v. City of Detroit, Mich.*, 405 F.2d 138, 146 (6th Cir. 1968) (in which the plaintiffs, whose properties had been subject to condemnation proceedings that were later discontinued, claimed they were entitled to additional compensation resulting from the City's earlier actions that accelerated the decline in value of the properties before the second condemnation proceedings); *Moore v. United States*, 41 Fed. Cl. 394, 399 (1998) (noting that state law "appears to minimize most factual differences between the [property interests conveyed], creating essentially the same interest in the [defined geographic area at issue]"); *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 635 (Tenn. 1996) (in which the alleged taking was installation of fiber optic cable and the trial court "granted class certification only as to affected owners in [the county over which that court had jurisdiction]"). In an attempt to substantiate a class, the separate opinion improperly narrows plaintiffs' allegations to a taking of "some portion of [their] fundamental property rights." *Beroth*, ___ N.C. at ___, ___ S.E.2d at ___ (Newby, J., dissenting in part and concurring in part). In addition to the rights to improve and sell property, plaintiffs allege that NCDOT's actions have "abridged and destroyed" their "right to [the] use and enjoyment of the properties." Plaintiffs further allege that their properties' values have been "destroyed and nullified" and therefore "NCDOT is obligated to purchase all of the properties." The separate opinion also improperly narrows the scope of NCDOT's offending actions to "the recordation of

the corridor maps and accompanying restrictions." *Id.* at ___, ___ S.E.2d at ___. As plaintiffs assert in their brief, plaintiffs complain of "a myriad of NCDOT actions and impacts not involving the restrictions of the Map Act" that have resulted in "a *de facto* taking of their property." We find it imprudent for this Court to narrow plaintiffs' allegations to conform to the requisites of a proper class. Here plaintiffs' proposed class is of such breadth that, despite some overlapping issues, a trial on the merits would require far too many individualized, fact-intensive determinations for class certification to be proper.[6]

Plaintiffs argue that "[c]lass certification is superior to Forsyth County dealing with possibly hundreds of identical lawsuits, and certainly prevents inconsistent results on the application of the proper legal standard." In response, NCDOT argues that "[e]fficient means of litigating multiple claims and parties involving the Northern Beltway already exist." Indeed, the Chief Justice has designated fifty-two individual cases brought by Northern Beltway property owners

---

[6] Our disagreement with the separate opinion arises from a fundamental "divergence of opinion" on the question of whether a correct takings test can be applied to the alleged class at this stage of the proceedings. *See Greensboro-High Point Airport Auth. v. Johnson*, 226 N.C. 1, 16, 36 S.E.2d 803, 814 (1946) (Barnhill, J., dissenting in part and concurring in part) (noting a divergence of opinion between the majority and the separate opinion on a particular question of law). We do not assume that the takings inquiry is "reserved for the damages phase of trial." *See Beroth*, ___ N.C. at ___, ___ S.E.2d at ___ (Newby, J., dissenting in part and concurring in part). We merely hold that plaintiffs' alleged class encompasses such differing issues that a takings test cannot be determined at this stage. As we have carefully set forth, case law supports our findings.

against NCDOT consisting of very similar claims[7] as "exceptional" pursuant to Rule 2.1 of the General Rules of Practice for the Superior and District Courts. In a joint motion for designation of the cases as exceptional, the parties asserted that adjudication of the cases will "involve substantial judicial expertise, requiring the [trial c]ourt to engage in a study and examination of various issues relating to the Winston-Salem Northern Beltway and apply the applicable principles of law." Given the "complex legal issues and numerous parties" involved, the parties requested a designation of the cases as "exceptional" so that all cases will be heard by the assigned Superior Court judge. The parties further argued that having the same judge preside over each case will promote judicial efficiency and prevent inconsistent results. Accordingly, the Chief Justice designated the cases as exceptional and assigned the cases to Superior Court Judge John O. Craig, III.

Although "[c]lass actions should be permitted where they are likely to serve useful purposes," "[t]he usefulness of the class action device must be balanced . . . against inefficiency or other drawbacks." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466. Here plaintiffs' proposed bifurcated trial is unmanageable because the individual factual issues tied to each unique parcel of land far outnumber the common issues

---

[7] These individual plaintiffs are represented by the same counsel as plaintiff-appellants in the case *sub judice*. In one motion for Rule 2.1 designation, plaintiffs' counsel even lists the case *sub judice* as a case "that involve[s] the same legal issues and [is] very similarly pleaded." It appears to us that a claim that some cases are exceptional is inconsistent with a claim by the same party that all these cases can be handled by means of a class action.

amongst all 800 property owners. Despite its premature determination of what takings test applies, the trial court correctly found that common issues of fact or of law would not predominate and therefore, plaintiffs have failed to establish the existence of a class.[8] *See id.* at 277, 354 S.E.2d at 462. Because this prerequisite has not been met, the trial court did not abuse its discretion by denying class certification. *See id.* at 284, 354 S.E.2d at 466.

For the foregoing reasons, we vacate the Court of Appeals' discussion on the merits of plaintiffs' inverse condemnation claim; however, we affirm the Court of Appeals' conclusion that the trial court did not abuse its discretion in denying plaintiffs' motion for class certification because individual issues predominate over common issues. This case is remanded to the Court of Appeals for further remand to the trial court with instructions to vacate the portion of its order analyzing the merits of plaintiffs' claim.

---

[8] At least four other courts have determined that class actions are inappropriate for inverse condemnation claims for similar reasons. *See City of San Jose v. Super. Ct.*, 12 Cal. 3d 447, 461, 115 Cal. Rptr. 797, 807, 525 P.2d 701, 711 (Cal. 1974) ("[T]he [class action] is incompatible with the fundamental maxim that each parcel of land is unique."); *Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 516 (Minn. 1985) (en banc) ("It is the unique nature of [a particular] property interest and its proof requirements that makes use of a class action inappropriate."); *Mattoon*, 1981 OK 92 at ¶ 23, 633 P.2d at 740 (holding that common questions do not predominate because "[h]ow much each individual landowner is impaired and how extensive is the interference with his rights to use and enjoy the property are the very questions which must be answered to determine the existence of taking without compensation"); *Palm Beach Cnty. v. Wright*, 641 So. 2d 50, 54 (Fla. 1994) ("[W]e are convinced that the taking issue may only be determined upon an individualized basis because the various property owners' interests will be different and will be affected by the thoroughfare map in a differing manner.").

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

Justice NEWBY dissenting in part and concurring in part.

The issue in this case is whether the trial court applied the correct legal analysis under North Carolina Rule of Civil Procedure 23 in denying plaintiffs' motion for class certification. A class exists when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members. Plaintiffs allege the recordation of the corridor maps and accompanying restrictions resulted in a taking of certain fundamental property rights of all the proposed class members. Because the government action was not for the safety and welfare of the public, the correct takings analysis is whether the corridor maps' restrictions substantially interfere with the rights of the owners of the affected properties. Thus, for purposes of Rule 23, the trial court should have decided whether the issue of substantial impairment of the property rights of all the owners subject to the corridor maps predominates over issues affecting only individuals. Because the trial court's order failed to apply this approach, the matter should be remanded to the trial court for reconsideration in light of the correct legal standard. If the trial court finds that a class exists, it should then exercise its discretion to consider whether class action is a superior method of adjudicating these claims.

The majority refuses to articulate the correct legal analysis to be applied, yet summarily declares that this group of landowners, all similarly affected by the corridor maps' blanket restrictions, do not share common issues of law or fact. A class exists when individuals have a common interest in law, yet the majority's approach prohibits the trial court from identifying the applicable law. The majority wrongly equates specifying the correct legal standard in a takings claim to a premature analysis of the substantive merits. But, how can a trial court know whether a common issue of law exists if prohibited from considering the applicable law? As done by both the trial court and the Court of Appeals and as our precedent requires, recognizing the law to be applied is a fundamental step in determining the existence of a class. The majority incorrectly assumes the takings inquiry is not a consideration for class certification, but is reserved for the damages phase of trial. Moreover, the majority's approach focuses exclusively on the unique nature of real property, arguably promulgating a per se rule that will bar class actions for claims of inverse condemnation. Most troubling, despite these uniform restrictions affecting the same fundamental property rights, the majority emphasizes that the trial court may employ differing tests to determine whether each owner has suffered a taking, thereby endorsing disparate treatment of the same fundamental property rights. *See Beroth Oil Co. v. NCDOT*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (2014) (stating that for each individual property owner the trial court may "use a *different* test in order to determine whether a taking has occurred").

*NEWBY, J., dissenting in part and concurring in part*

Over sixteen years ago, the North Carolina Department of Transportation recorded corridor maps identifying property in the path of the Northern Beltway in Forsyth County. Though some of the project's past delays stem from a federal court order, *N.C. Alliance for Transp. Reform, Inc. v. USDOT*, 713 F. Supp. 2d 491, 499 (M.D.N.C. 2010), the restrictions imposed by state law never expire, and the majority acknowledges that "NCDOT has stated that no funds are available to begin acquisitions for the next ten years." Under subsection 136-44.51(a) of our General Statutes, "[a]fter a transportation corridor official map is filed with the register of deeds, no building permit shall be issued for any building or structure or part thereof located within the transportation corridor, nor shall approval of a subdivision . . . be granted with respect to property within the transportation corridor." N.C.G.S. § 136-44.51(a) (2013). By recording a corridor map, DOT is able to foreshadow which properties will eventually be taken for roadway projects and in turn, decrease the future price the State must pay to obtain those affected parcels. According to plaintiffs, these blanket restrictions have rendered all the property within the area undevelopable and unmarketable and have substantially impeded all the owners' rights to the use and enjoyment of their properties. Specifically, plaintiffs claim this cloud over the Northern Beltway properties prevents *all* owners from selling or improving their land—fundamental rights of property ownership—thereby drastically decreasing the market value of all affected properties. 1 James A. Webster, Jr., Patrick K. Hetrick & James B. McLaughlin, Jr., *Webster's Real*

*Estate Law in North Carolina* §§ 1.02, 1.04 (6th ed. Nov. 2012) [hereinafter *Webster's*].

As a result, plaintiffs sought a declaratory judgment, alleging the recordation of the maps resulted in an unlawful "taking by inverse condemnation" and violated their rights under the federal and state constitutions. Plaintiffs moved for class certification under North Carolina Rule of Civil Procedure 23 on behalf of all similarly situated owners of property subject to the recorded corridor maps. The trial court, however, saw the recordation of the maps as an exercise of the State's police power and applied an ends-means analysis generally reserved for regulatory takings. The trial court concluded that a regulatory taking would only occur when the "interference renders the use of the property impractical and the property itself of no reasonable value." According to the trial court, common issues of law or fact therefore would not predominate because the ends-means test would have to be applied on a property-by-property basis to determine whether a taking had occurred. Thus, the trial court concluded that "plaintiffs have not defined a 'class.'" Then, assuming *arguendo* that plaintiffs did define a class, the trial court found that a class action is not a superior method of adjudication because "whether a taking has occurred must be determined on a property-by-property basis." The Court of Appeals applied the same approach, first identifying a legal standard then applying that standard under the framework of Rule 23. *Beroth Oil Co. v. NCDOT*, ___ N.C. App. ___, ___, 725 S.E.2d 651, 659-67 (2012).

While a court's decision whether to allow a case to proceed as a class action involves a multi-part inquiry, the pivotal issue raised in this case is whether plaintiffs allegations are sufficient to constitute a class. Under Rule 23, a class exists "when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members." *Faulkenbury v. Teachers' & State Emps.' Ret. Sys. of N.C.*, 345 N.C. 683, 697, 483 S.E.2d 422, 431 (1997) (citing *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 280, 354 S.E.2d 459, 464 (1987)). When determining whether members have a predominantly common interest, the trial court is to construe Rule 23 liberally and "[t]ak[e] the allegations of the complaint as true." *Crow*, 319 N.C. at 280, 281, 354 S.E.2d at 464, 465. "Whether a proper 'class' under Rule 23(a) has been alleged is a question of law." *Id.* at 280, 354 S.E.2d at 464. Then, "[i]f the prerequisites for a class action are established, it is within the discretion of the trial court as to whether the matter may proceed as a class action." *Faulkenbury*, 345 N.C. at 697, 483 S.E.2d at 431; *see also Blitz v. Agean, Inc.*, 197 N.C. App. 296, 300, 677 S.E.2d 1, 5 (2009) ("With these principles in mind, the standard of review applicable to class certification decisions can be succinctly summarized as follows: We review class certification rulings for abuse of discretion. We review *de novo* the [trial] court's conclusions of law that informed its decision to deny class certification." (citations and internal quotation marks omitted)), *disc. rev. denied and cert. denied*, 363 N.C. 800, 690 S.E.2d 530 (2010). "Class actions should

be permitted where they are likely to serve useful purposes such as preventing a multiplicity of suits or inconsistent results." *Crow*, 319 N.C. at 284, 354 S.E.2d at 466.

The alleged class here contends the predominant issue of law or fact is whether the recordation of the corridor maps and accompanying blanket restrictions resulted in taking some portion of the owners' fundamental property rights. To make this determination, unlike the majority, I believe the trial court must apply the correct takings analysis. Only after the correct takings test is established can the trial court determine if common issues of law and fact predominate.

To determine which takings test is appropriate in a given case, we must first ascertain whether the government is acting under its police power or under its power of eminent domain. *See Barnes v. N.C. State Highway Comm'n*, 257 N.C. 507, 514, 126 S.E.2d 732, 737-38 (1962) ("The question of what constitutes a taking is often interwoven with the question of whether a particular act is an exercise of the police power or of the power of eminent domain." (citation and quotation marks omitted)). When the government exercises the police power, it acts to protect the "public health, safety, morals and general welfare." *A-S-P Assocs. v. City of Raleigh*, 298 N.C. 207, 213, 258 S.E.2d 444, 448 (1979) (citations omitted). Under this power of *protection*, the "unrestricted use or enjoyment" of an owner's property "is taken from him because his use or enjoyment of such property is injurious to the public

welfare."  1 Julius L. Sackman, *Nichols on Eminent Domain* § 1.42[2], at 1-203 (rev. 3d ed. 2013) [hereinafter *Nichols*]; *see also* Ernst Freund, *The Police Power* § 511, at 546 (1904) [hereinafter *Freund*] ("Under the police power, rights of property are impaired not because they become useful or necessary to the public, or because some public advantage can be gained by disregarding them, but because their free exercise is believed to be detrimental to public interests . . . .").  We apply an "ends-means" analysis in cases involving land use restrictions enacted under the State's police power, meaning we first determine "whether the ends sought, *i.e.*, the object of the legislation, is within the scope of the power," then consider "whether the means chosen to regulate are reasonable."  *Responsible Citizens in Opposition to the Flood Plain Ordinance v. City of Asheville*, 308 N.C. 255, 261, 302 S.E.2d 204, 208 (1983).

Under eminent domain, on the other hand, property "is taken from the owner and applied to public use because the use or enjoyment of such property or easement therein is beneficial to the public."  *Nichols* § 1.42[2], at 1-203; *see also Freund* § 511, at 546-47 ("[I]t may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful, or as Justice Bradley put it, because 'the property itself is the cause of the public detriment.' " (quoting *Davidson v. New Orleans*, 96 U.S. 97, 107, 24 L. Ed 616, 620 (1877) (Bradley, J., concurring)).  A taking by eminent domain for the *benefit* or *advantage* of the public occurs when government action causes a

"substantial interference with elemental rights growing out of the ownership of the property." *Long v. City of Charlotte*, 306 N.C. 187, 199, 293 S.E.2d 101, 109 (1982) (citations omitted). A substantial interference with a single fundamental right inherent with property ownership may be sufficient to sustain a takings action; wholesale deprivation of all rights is not required. To recover for such an interference, "the owner must establish not merely an occasional trespass or nuisance, but an interference substantial enough to reduce the market value of his property." *Id.* at 200, 293 S.E.2d at 110. A "physical touching of the land is not necessary." *Id.* at 199, 293 S.E.2d at 109. When, as here, the State fails to file a complaint declaring its intent to act under the power of eminent domain, an affected property owner "may initiate an action to seek compensation for the taking" in a claim for inverse condemnation. N.C.G.S. § 40A-51 (2013); *see also* 2 *Webster's* § 19.02[1], at 19-10 (" 'Inverse condemnation' is a device which forces a governmental body to exercise its power of condemnation even though it may have no desire to do so.").

While reducing the cost for the future acquisition of property may be a laudable public policy, that purpose falls under the category of public benefit or advantage rather than public protection. Thus, the trial court erred by applying a test reserved for the preservation of "public health, safety, morals and general welfare." *A-S-P Assocs.*, 298 N.C. at 213, 258 S.E.2d at 448; *see also Freund* § 511, at 546-47; *Nichols* § 1.42[2], at 1-203. Accordingly, the proper takings test in this

case is the less stringent substantial interference test. In other words, to determine whether a class exists, the trial court should have weighed whether plaintiffs collectively alleged a common substantial interference with certain property rights of all owners in the Northern Beltway corridor and whether that issue predominates. For purposes of Rule 23, this is a common issue of law or of fact, one which the trial court failed to consider.

We should remand this case to the trial court for it to apply the correct legal standard and then exercise its discretion over the superiority of class action adjudication. *See Crow*, 319 N.C. at 284, 354 S.E.2d at 466 ("If the prerequisites to a class action are established on remand, the decision whether a class action is superior to other available methods for the adjudication of this controversy continues to be a matter left to the trial court's discretion."). Significantly, all seven members of this Court agree that the trial court acted under a misapprehension of existing law by relying on an ends-means analysis at this stage of its Rule 23 inquiry. *Beroth*, ___ N.C. at ___, ___ S.E.2d at ___ ("[W]e believe that one of the trial court's fundamental errors was choosing to employ *any* test to determine the extent of damages suffered by all 800 landowners and whether a taking has occurred at this stage of the proceedings."). Accordingly, we should no longer review the trial court's order with the same deference the abuse of discretion standard demands. *See Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 463, 469, 597 S.E.2d 674, 689, 693 (2004) (noting that the admissibility of expert testimony "is within the

sound discretion of the trial court and will only be reversed on appeal for abuse of discretion," but vacating the judgment of the trial court because the " 'judgment appealed from was entered under a misapprehension of the applicable law' " (citations omitted)). "Because the trial judge 'did not have the legal standard [articulated] today to guide him in his consideration of the case, . . . it is not reasonable to expect him to have applied it without the benefit of this opinion,' " and this Court should therefore remand this case so the trial court may reconsider plaintiffs' motion for class certification under the appropriate legal standard. *Whitacre P'ship v. Biosignia, Inc.*, 358 N.C. 1, 38, 591 S.E.2d 870, 894 (2004) (second alteration in original) (citation omitted); *see also Howerton*, 358 N.C. at 469, 597 S.E.2d at 693 (" 'When the order or judgment appealed from was entered under a misapprehension of the applicable law, the judgment, including the findings of fact and conclusions of law on which the judgment was based, will be vacated and the case remanded for further proceedings.' " (citation omitted)); *Blitz*, 197 N.C. App. at 312, 677 S.E.2d at 11 ("[W]e hold that the trial court's ruling denying class certification was based upon a misapprehension of law, and thus constituted an abuse of discretion.  [W]here a ruling is based upon a misapprehension of the applicable law, the cause will be remanded in order that the matter may be considered in its true legal light." (second alteration in original) (citations and internal quotation marks omitted)).

The uniqueness and extent of each owner's damages are of no consequence to the takings issue here. Regardless of the past, present, or planned use of each parcel, certain rights to improve and sell associated with each allegedly have been impaired in the same manner by the same uniform restrictions. The monetary values eventually placed on the rights to improve and sell property do not affect the core question of whether the owners may still exercise those rights. Even the majority concedes that "NCDOT's generalized actions may be common to all" owners of property subject to the Northern Beltway corridor maps. Thus, if one owner suffered a taking of certain fundamental property rights based upon the corridor maps' blanket restrictions, all owners suffered a taking.

Admittedly, the extent of damages owed to each owner will vary. But the fact that the owners will "receive recoveries in different amounts," *Faulkenbury*, 345 N.C. at 698, 483 S.E.2d at 431-32, will not preclude class certification so long as the takings issue predominates. *E.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 73 L. Ed. 2d 868 (1982) (holding that the physical intrusion of a cable wire constitutes a taking in a suit brought as a class action); *Amen v. City of Dearborn*, 718 F.2d 789, 798 (6th Cir. 1983) (holding in a class action "that the City's deliberate course of conduct caused such substantial damage to plaintiffs' properties that the properties in effect were actually taken within the meaning of the fifth and fourteenth amendments for which just compensation is due"), *cert. denied*, 465 U.S. 1101, 80 L. Ed. 2d 127 (1984); *Foster v. City of Detroit, Mich.*, 405

F.2d 138, 146 (6th Cir. 1968) (affirming a lower court's ruling in a class action takings suit that "there are important common questions of law and fact affecting all members of the class which override the factual differences regarding the damages suffered by each individual," making "a class action under Rule 23(a)(3) . . . proper in this situation" (citation omitted)); *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 638 (Tenn. 1996) ("It is likewise irrelevant that the case involves property damage. Though often characterized as 'unique,' this quality does not foreclose cases involving property damages from Rule 23 procedures. Literally dozens of class actions involving property damages have proceeded in our state and federal courts." (citations omitted)).

The majority's contention that plaintiffs' proposal for a bifurcated trial is "unmanageable" ignores the effect of denying class certification. Under the majority's reasoning, not only will each owner have to proceed individually on damages, but each will also have to prove that a taking occurred under differing, unarticulated tests. Inevitably this approach will result in disparate treatment of the same fundamental property rights. *See High Rock Lake Partners v. NCDOT*, 366 N.C. 315, 321, 735 S.E.2d 300, 304 (2012) (noting that this Court has a duty to protect fundamental property rights and that "governmental restrictions on the use of land are construed strictly in favor of the free use of real property" (citation and quotation marks omitted)). Our State now potentially bears the burden of over eight hundred identical takings claims when that issue could easily be resolved for

all plaintiffs at one time. This outcome is inconsistent with the objectives of Rule 23 to facilitate " 'the efficient resolution of the claims or liabilities of many individuals in a single action' " and eliminate " 'repetitious litigation and possible inconsistent adjudications.' " *Crow*, 319 N.C. at 280, 354 S.E.2d at 464 (citation omitted). Consequently, I dissent in part and concur in part.

Justice MARTIN joins in this opinion.