Hefner v. Mission Hosp., Inc., 2014 NCBC 64.

STATE OF NORTH CAROLINA

COUNTY OF BUNCOMBE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 3088

STEPHEN HEFNER, on behalf of
himself and all others similarly
situated,

Plaintiff,

v.

MISSION HOSPITAL, INC., a North
Carolina Corporation; and MISSION
HEALTH SYSTEM, INC., a North
Carolina Corporation, collectively
doing business as MISSION
HEALTH; and DOES 1 through 25,
inclusive,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER DENYING PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION**

{1}     THIS MATTER is before the Court on Plaintiff's Motion for Class Certification ("Motion"), made pursuant to Rule 23 of the North Carolina Rules of Civil Procedure ("Rules").

*Higgins Benjamin PLLC by John F. Bloss and Barry L. Kramer Law Offices by Barry L. Kramer (pro hac vice) for Plaintiff.*

*Robinson Bradshaw & Hinson, P.A. by Robert W. Fuller and Heyward H. Bouknight, III for Defendants.*

Gale, Chief Judge.

## I.     INTRODUCTION

{2}     Plaintiff Stephen Hefner ("Hefner" or "Plaintiff") asks the Court to certify a class, defined more specifically below, but generally consisting of patients

at Defendant Mission Hospital, Inc. ("Mission")[1] who received emergency treatment, who were billed based on Mission's standard "Chargemaster" rates, and who were "self-pay." After considering the developed record, reviewing briefs and authorities cited, and hearing oral argument, the Court concludes that Plaintiff has failed to demonstrate the actual existence of a class because individualized issues predominate over those common issues of law and fact upon which Plaintiff seeks to support class certification. Accordingly, as more fully explained below, the Motion is DENIED.

## II. PROCEDURAL BACKGROUND

{3} Plaintiff filed his Class Action Complaint on June 28, 2012. The case was designated a complex business case on August 7, 2012, assigned to the Hon. Calvin H. Murphy on August 8, 2012, and reassigned to the undersigned on July 2, 2014.

{4} Defendants' August 8, 2012, motion to dismiss was denied by Judge Murphy's April 18, 2013, Order.

{5} The parties undertook discovery relevant to class action matters, including the opportunity to designate and depose expert witnesses.

{6} After this discovery, Plaintiff filed his Motion for Class Certification on December 16, 2013. Defendants filed their opposition on February 17, 2014. Plaintiff replied on March 10, 2014.

{7} Defendants further filed their Motion to Strike Plaintiff's Motion for Class Certification ("Motion to Strike") on February 17, 2014, asserting that Plaintiff sought to modify the definition of the putative class in briefing. Although the Motion to Strike was fully briefed, it is effectively mooted by the Court's ruling on Plaintiff's Motion for Class Certification.

---

[1] Although Defendants include Mission Health System, Inc. as a whole, the parties have consented to restricting the proposed class to only patients who received emergency care medical treatment at Mission Hospital, Inc.

{8}     Prior to oral argument, the Court accepted supplemental informal filings addressing various points and case authorities.

{9}     The Motion is ripe for disposition.

## III.   RELEVANT FACTS

{10}     Class certification is governed by Rule 23. Rule 23 does not, by its express terms, specify that findings of fact must be made, but the appellate courts recognize that "findings of fact are required . . . when rendering a judgment granting or denying class certification in order for the appellate courts to afford meaningful review under the abuse of discretion standard." *Nobles v. First Carolina Commc'ns, Inc.*, 108 N.C. App. 127, 133, 423 S.E.2d 312, 316 (1992). The standard that the trial court employs depends on whether the challenge is to a plaintiff's initial pleading of a class or to a plaintiff's ability to prove the existence of a class after discovery. A plaintiff must be given the benefit of certain presumptions at the pleadings stage, but when the Court considers whether a class exists based on a developed record, the plaintiff bears the evidentiary burden of satisfying the Court that the putative class exists. *Crow v. Citicorp Acceptance Co.*, 319 N.C. 274, 281–82, 354 S.E.2d 459, 464–65 (1987). The trial court is granted substantial discretion in making that determination. *See Harrison v. Wal-Mart Stores, Inc.*, 170 N.C. App. 545, 547, 613 S.E.2d 322, 325 (2005) (citing *Faulkenbury v. Teachers' & State Emps.' Ret. Sys. of N.C.*, 345 N.C. 683, 699, 483 S.E.2d 422, 432 (1997)).

{11}     While the standard has not been as squarely stated in North Carolina appellate opinions, the Court believes that the correct evidentiary requirement is a preponderance of the evidence standard, as was expressly stated by the Third Circuit Court of Appeals, which the Court believes to be consistent with North Carolina precedent. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 591 (3rd Cir. 2012).[2] Even assuming that a plaintiff initially meets this burden, the trial

---

[2] Although not binding on North Carolina courts, extensive federal court interpretation of Rule 23 of the Federal Rules of Civil Procedure has been deemed instructive to North Carolina courts'

court has a further reservoir of discretion to determine whether using the class action procedure is the superior method to adjudicate the controversy. *See Crow*, 219 N.C. at 284, 354 S.E.2d at 366.

{12}   The fact finding for a class certification determination is limited to whether prerequisites to certification have been met.  The Court does not resolve factual disputes necessary to deciding the ultimate merits of claims and defenses at this stage. *Beroth Oil Co. v. N.C. Dept. of Transp.*, ___ N.C. ___, ___, 757 S.E.2d 466, 474 (2014) (citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974)). But, in determining the existence of a class by addressing the predominance of either common or individualized issues, the Court must assess the legal and factual issues raised by both claims and defenses. *See id.* at ___, 757 S.E.2d at 474 n.5.

{13}   In this case, the Court does not believe that it is required to resolve substantial contested facts to determine class certification, because the developed record demonstrates that the majority, if not all, of the essential facts on which class certification turns are uncontested.  The significant conflict is, rather, in regard to how those facts frame the issues to be tried and whether resolution of those issues is predominated by common questions or individualized questions.  The parties clearly have divergent views as to the appropriate weighting of facts or issues common to all class members and how they are to be compared to those that must be separately resolved as to individual class members.

{14}   In determining whether a class exists, the Court is guided by the following facts:

### A.      The Parties

{15}   Plaintiff Stephen Hefner is a resident of Shelby, North Carolina, currently employed by Engineered Control Solutions in Raleigh, North Carolina.  At the relevant time, Hefner worked as a salesperson in Asheville, North Carolina.

---

interpretation of the North Carolina rule. *See Ehrenhaus v. Baker*, 216 N.C. App. 59, 69–70, 717 S.E.2d 9, 17 (2011).

{16}    Defendant Mission Hospital, Inc. is a not-for-profit, full-service hospital located in Asheville, North Carolina.

## B.    Plaintiff's Visit to Mission Hospital

{17}    On November 11, 2011, Hefner presented at Mission's emergency room complaining of tingling and numbness on the left side of his body.

{18}    Hefner had a high-deductible health insurance plan with Blue Cross Blue Shield of North Carolina ("BCBSNC"), providing coverage only for charges in excess of an annual $5,000 deductible.

{19}    The parties disagree whether Hefner presented his insurance card before receiving treatment. It is apparent that Mission did not keep a copy of it and did not fully realize his coverage until discovery. Mission initially billed Hefner as if he had been uninsured.

{20}    Hefner signed Mission's Consent and Authorization Form, which governs responsibility for costs incurred. The form states, in relevant part:

> 6. FINANCIAL RESPONSIBILITY. For all services and/or supplies not covered or deemed not medically necessary by my health plan, I agree to accept financial responsibility and to pay Mission Hospitals directly. Full payment is due within thirty (30) days of billing or as otherwise arranged by mutual consent of both parties.

> 7. FINANCIAL AGREEMENT. I agree that in consideration of the services to be rendered, I am obligated to pay the account owed by me to Mission Hospitals in accordance with the regular rates and terms of Mission Hospitals.

(Defs.' Memo. Supp. Mot. Dismiss Ex. A ¶¶ 6–7.)

{21}    Hefner underwent several diagnostic procedures and was then discharged. Mission billed Hefner a total of $4,217.08. Mission later offered Hefner a twenty percent "prompt payment" discount, which would have reduced his bill to $3,373.66. Hefner did not accept the discount. He testified that he was unable to pay the discounted amount. He has made partial payments of $175. The remaining balance of $4,042.08 was unpaid when Hefner filed his Complaint.

{22}    Hefner complains that Mission undertook aggressive collection efforts until he filed his Complaint.

{23}    When Mission realized during discovery that Hefner was covered by BCBSNC, it recalculated the bill in accordance with rates charged to BCBSNC insureds.  Mission applies these rates to services or treatments within an insured's deductible, so long as the underlying treatment is covered by the insurance contract.  The recalculated charge was $3,231.97.

## C.    Mission Hospital's Billing Practices

{24}    The "regular rates" referred to in Mission's Consent and Authorization form are those compiled on a spreadsheet referred to as the "Chargemaster."  The Chargemaster contains over 35,000 entries, reflecting pricing for all treatments within the hospital.  All Mission billing is on Chargemaster rates, but final charges submitted to a patient or his insurer may reflect various discounts and reductions.  Those reductions may be discounts negotiated with insurance carriers, which vary from carrier to carrier, or other discounts, such as charity care discounts or prompt payment discounts for self-pay or uninsured patients.  Pursuant to federal law, final charges billed through Medicaid are computed differently.

{25}    Mission indicates that the Chargemaster rates are calculated "gross" prices that reflect the costs required to provide these services, after taking into consideration bad debt and discounting, together with a markup that tends to decrease as the cost for the service or product increases.  Mission guards the confidentiality of its Chargemaster.  Patients are not advised in advance as to the charge for any treatment or service.

{26}    Negotiation rates may vary significantly from carrier to carrier.  Discounts to the Chargemaster rates for any patient may also vary by the type of service, the length of the patient's stay, and a myriad of other variables.

{27}    Uninsured or self-pay patients are initially billed at the full Chargemaster rates.  However, they may be eligible for discounts.

{28}  Mission employs six financial counselors to assist patients in paying for their treatment.  Mission offers at least two types of discounts to patients: a "prompt payment" discount and a "charity care" discount.  The amount of a prompt payment discount is a discretionary discount offered by Mission financial counselors based on information provided by the patient, and may vary from patient to patient.  The financial advisor may offer a discount, or alternatively offer special payment terms such as an extended repayment period.  The charity care discount is calculated using a sliding scale based on the federal poverty guidelines.  This discount potentially reduces a patient's payment obligation to zero.  All patients are able to apply for the charity care discount through a Mission patient registration representative or financial counselor.

{29}  Mission also assists patients in qualifying for Medicaid.  It is not unusual that a patient will receive treatment at a time the patient has applied for but has not yet been deemed eligible for Medicaid.  Payment for charges billed may be held in abeyance as efforts to qualify for Medicaid continue, with billing adjusted upon qualification.

{30}  From 2008 to 2012, 98,674 uninsured patients were treated and released from Mission's Emergency Department.

## D.  The Putative Class

{31}  The Complaint requests that the Court certify a class defined as follows: "All individuals (or their guardians or representatives) who have (a) received emergency care medical treatment at Mission Hospital or another Mission Health hospital and (b) were self-pay patients with respect to the emergency services and/or supplies provided." (Class Action Compl. ¶ 36.)

{32}  Following discovery, in his Motion for Class Certification, Plaintiff asks that the Court certify a class defined as

> consisting of all individuals (a) who received emergency care medical treatment at Mission Hospital, (b) who were billed at the hospital's full Chargemaster Rates for such treatment, (c) on whose behalf no part of the cost for such treatment was paid by private insurers or

governmental entities, and (d) who received no discounts, adjustments, and/or writeoffs which totaled in excess of 50% of the Chargemaster Rates for such treatment.

(Br. Supp. Pl.'s Mot. Class Cert. 1–2 (footnotes omitted).)

{33}    If the Court were to certify such a class, it would need to fix the date on which class membership should to be determined, because some patients may fit the definition on some days but not on others, such as, for example, those whose financial circumstances change or who are later deemed eligible for Medicaid.  As the Court does not certify a class in this Order, it does not further consider how such a date should be determined.

## IV.    ANALYSIS

### A.    Standards for Class Certification

{34}    Rule 23 provides a basic framework for class certification, but the North Carolina courts, often drawing on more-developed federal precedent, have elaborated on prerequisites a court must find to certify a class.  These include

> (1) the existence of a class, (2) that the named representative will fairly and adequately represent the interests of all class members, (3) that there is no conflict of interest between the representative and class members, (4) that class members outside the jurisdiction will be adequately represented, (5) that the named party has a genuine personal interest in the outcome of the litigation, (6) that class members are so numerous that it is impractical to bring them all before the court, [and] (7) that adequate notice of the class action is given to class members.

*Perry v. Union Camp Corp.*, 100 N.C. App. 168, 170, 394 S.E.2d 681, 682 (1990) (citing N.C. R. Civ. P. 23; *Crow*, 319 N.C. at 282, 354 S.E.2d at 465).

{35}    Here, the success of the Motion turns the critical, initial determination of whether Plaintiff has demonstrated the actual existence of a class by a preponderance of the evidence.  Finding that Plaintiff has not so demonstrated a class, the Court need not further address Mission's arguments that Plaintiff has not met the additional prerequisites for class certification.

{36}    "Under Rule 23, a class exists 'when the named and unnamed members each have an interest in either the same issue of law or of fact, and that issue predominates over issues affecting only individual class members.'" *Beroth Oil Co.*, ___ N.C. at ___, 757 S.E.2d at 478 (quoting *Faulkenbury*, 345 N.C. at 697, 483 S.E.2d at 431).  It is not adequate that a Plaintiff merely identify common contentions that will arise.  "That common contention . . . must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores v. Dukes*, 131 S. Ct. 2541, 2551 (2011).  While federal courts refer to the "commonality" and "predominance" factors keyed to particular subsections of Federal Rule of Civil Procedure 23, the same factors under North Carolina's Rule 23 are captured within the definition of a class. *See Beroth Oil Co.*, ___ N.C. at ___, 757 S.E.2d at 478.

{37}    In *Beroth Oil Co. v. N.C. Department of Transportation* the plaintiff sought class certification for a group of more than 800 landowners challenging aspects of the N.C. Department of Transportation's taking of their property for the purpose of building a beltway in Forsyth County.  *Id.* at ___, 757 S.E.2d at 469–70.  In upholding the trial court's denial of the plaintiff's motion for class certification, the North Carolina Supreme Court noted the importance of the uniqueness of each putative class member's circumstance to the court's takings analysis, stating that "plaintiffs have not shown that all 800 owners within the corridor are affected in the same way and to the same extent." *Id.* at ___, 757 S.E.2d at 474.  The court further reasoned that "'liability can be established only after extensive examination of the circumstances surrounding each of the affected properties.'  This discrete fact-specific inquiry is required because each individual parcel [of land] is uniquely affected by NCDOT's actions." *Id.* (quoting *Beroth Oil Co.* __ N.C. App. at __, 725 S.E.2d 651, 663 (2012)).  Therefore, the common question—that each class member experienced a taking—did not predominate over the individualized question of whether the compensation paid for each taking complied with North Carolina requirements.  Accordingly, the plaintiff had failed to demonstrate the actual

existence of a class even though there were issues common to all putative class members.

{38}    In contrast, the North Carolina Supreme Court's opinion in *Faulkenbury v. Teachers' & State Employees' Retirement System of N.C.* demonstrates that the mere existence of individualized questions will not defeat certification when common issues necessary to determine liability predominate, leaving ancillary issues of damages to be decided individually.  345 N.C. 683, 483 S.E.2d 422.  *Faulkenbury* involved an allegation by public employees, based on impairment of contract, that the State of North Carolina had violated their constitutional rights by reducing the employees' vested benefits under the Teachers' and State Employees' Retirement System, thus creating a putative class of all public employees who were subject to the benefit reduction. *Id.*  The North Carolina Supreme Court affirmed the Court of Appeals' decision to certify the class of state employees, reasoning that the common question of liability, based on a contention that retirement benefits were underpaid by unlawfully eliminating or changing vested contracts, predominated over issues that affected only individual class members, such as the actual amount of benefits that had been eliminated or reduced.  *Id.* at 699, 483 S.E.2d at 432.  Because the determination of liability was rooted in whether the state reduced the vested benefit, and not a subjective analysis of the amount of the reduction, the *Faulkenbury* court held that issues of damages were collateral to the overarching liability determination.  *See id.* at 698, 483 S.E.2d at 432.

### B.    The Respective Contentions

{39}    The  parties agree that Mission's charges must be reasonable.  Plaintiff contends that  Mission's charges are excessive and unreasonable.  Mission contends that they are reasonable.  Plaintiff contends that a common question of reasonableness can be determined by a method which can be generalized to all patients.  Mission contends that the reasonableness of any charge must be based on a patient-by-patient and charge-by-charge inquiry.

{40}    Seeking to find precedential support for his argument, Plaintiff contends that determining the reasonable value of Mission's services is comparable to measuring damages, and cites *Faulkenbury* for the proposition that any individualized inquiry into charges on a per-patient basis is collateral to common liability issues of whether Mission's overall charges are reasonable or whether self-pay patients are discriminated against by Mission's billing.  (Reply Br. Supp. Class. Cert. 10 (citing *Faulkenbury*, 345 N.C. at 698, 483 S.E.2d at 423).)  Plaintiff argues that determining whether Mission's Chargemaster rates are unreasonable may be resolved by calculating damages within an acceptable overall range and using this calculation to control liability.  (Reply Br. Supp. Class. Cert. 10–11 (citing *Weyerhaeuser v. Godwin Bldg. Supply*, 292 N.C. 557, 561, 234 S.E.2d 605, 607 (1977).)  Plaintiff offers that courts have adopted various approaches to determine such an acceptable range without the need to make patient-by-patient inquiries, such as using blended averages for insurance and Medicare/Medicaid reimbursement rates or determining an appropriate average profit percentage to be applied to actual calculated costs for hospital services.  (Reply Br. Supp. Class. Cert. 10–11.)  Plaintiff urges that insisting on an individualized inquiry effectively means that Mission's rates can never be challenged, because no individualized claim is sufficiently large to justify the expense of litigation. (Br. Supp. Pl.'s Mot. Class Cert. 15–16.)

{41}    Based on this logic, Plaintiff defines the overarching common issue to be decided as "Is Mission Hospital entitled to bill and enforce payment for the emergency services it provides to self-pay patients at its artificially inflated 'Chargemaster' rates?" (Br. Supp. Pl.'s Mot. Class Cert. 4.)  Plaintiff then argues that this ultimate issue turns on the following common questions that can and should be answered on a class-wide basis:

(1) Whether Defendants had a policy and practice of billing class members substantially more than it was [sic] reimbursed by other patients for the same emergency care treatment and services;

(2) Whether the "regular rates and terms" in Mission Hospital's Contract can be construed to refer to its Chargemaster rates, where (a) the Contracts do not reference the Chargemaster rates; (b) the Chargemaster rates are not published or available on Mission's website, and (c) the vast majority of Mission's patients and their government or private insurers are not charged at, do not pay, and are not expected to pay Chargemaster rates;

(3) Whether Defendants are limited, under express or implied contract law, to charging uninsured patients no more than the reasonable value of its [sic] emergency treatment and services where its [sic] Contract form contains an open or indefinite pricing term;

(4) Whether Defendants have charged and continue[] to charge Plaintiff and putative class members unreasonable and/or unconscionable amounts for emergency medical care in breach of its [sic] Contract and the covenant of good faith and fair dealing;

(5) Whether Defendants have been unjustly enriched by these practices; and

(6) Whether the acts and conduct of Defendants render them liable to Plaintiff and the Class for restitution, injunctive relief and/or damages.

(Br. Supp. Pl.'s Mot. Class Cert. 15.)

{42}    Mission contends that it is impossible to determine the reasonableness of charges on an across-the-board basis. It argues that the above-listed questions are not, in fact, common, but instead depend upon individualized inquiries. Mission argues that Plaintiff's invitation to simply apply an average or a blanket discount to all charges should not be accepted, particularly, because Mission will present individualized evidence to demonstrate the overall and individualized reasonableness of its charges. (Defs.' Mem. Opp'n. Class Cert. 17 (citing *Blades v. Monsanto Co.*, 400 F.3d 562 (8th Cir. 2005).) Mission suggests that, in order to certify a class,

for each chargemaster code in each of hundreds of thousands of bills, Mission would have to introduce evidence to show (i) the cost of the service, (ii) the charges of other hospitals, for the same services, (iii) the amount private insurers have agreed to pay, and the terms on which they have agreed to make payment, [and] (iv) the appropriate adjustments to be made given likely problems with collectability, which would be uniquely relevant to uninsured patients.

(Defs.' Mem. Opp'n. Class Cert. 17.) Further attacking the lack of commonality, Mission argues that it would be impossible to determine details relevant to the damages determination, such as which patients had already paid their bills, which patients were currently eligible for larger discounts, and other individualized issues. (Defs.' Mem. Opp'n. Class Cert. 13.) Inquiry would have to extend into various discounts for which uninsured or self-pay patients may be eligible.

## C.    Discussion

{43}    The Court concludes that this case is much more comparable to *Beroth* than Faulkenbury. After thoroughly considering the parties' contrasting positions in light of the developed record, the Court concludes, as did the court in *Beroth*, that "Plaintiff['s] argument oversimplifies the issue of liability." *Beroth Oil Co.*, ___N.C. at ___, 757 S.E.2d at 472. The Court rejects Plaintiff's assertion that simply "[b]ecause [Mission]'s behavior was uniform towards all class members, it predominates over class members' individual behavior." (Br. Supp. Pl.'s Mot. Class Cert. 18.) The fact that each Mission patient may sign the same Consent and Authorization Form agreeing to assume responsibility for Mission's regular charges does not lead to the conclusion that liability can be determined on a class-wide basis through calculating an average. The central issue that runs through each of Plaintiff's proposed questions is whether the rates charged to either uninsured or self-pay patients were arbitrary, as opposed to a reasonable reflection of actual costs, and whether they must be found to be unreasonable when comparing charges of insured patients with those of self-pay or uninsured patients. Plaintiff seeks to avoid an individualized inquiry in the Court's liability determination by urging that the Court need only develop some generalized measure of reasonableness based on averages of overall charges, reimbursements, or profit margins. Having reviewed Plaintiff's argument and the authority upon which the argument relies,[3] the Court

---

[3] *See Nassau Anesthesia Assoc. P.C. v. Chin*, 924 N.Y.S.2d 252 (N.Y. Dist. Ct. 2011); *Gaasland Co. v. Hyak Lumber & Millwork, Inc.*, 257 P.2d 784 (Wash. 1953). Not only do neither of these cases involve class actions, Plaintiff's argument conflates also the analysis of whether the charges were

rejects the notion that it would be appropriate or fair, either to Mission or to the individual members of the class Plaintiff purports to represent, to reduce the question of the reasonableness of individualized charges to some form of averaging. Rather, the Court believes that there is not sufficient uniformity in Mission's application of charges and discounts, either to insured patients or those who are uninsured or self-pay, to reduce liability to a question of averages.[4]

{44}    *Beroth* makes it clear that a Plaintiff seeking class certification must produce evidence that each putative class member was affected the same way and at least to approximately the same extent by a defendant's actions.  If liability as to the proposed class can only be established after an individualized investigation into the circumstances of each class member, the class does not satisfy the commonality prerequisite.

{45}    Here, the developed record indicates that Plaintiff has not met the predominance required by the *Beroth* test, but rather that individual issues of fact predominate over common issues of law or fact.  It is apparent that Mission's treatment of the patients did not affect each patient in the same way and to the same extent, and that ultimately, the reasonableness of any particular charge, either before or after discounting, must be examined individually.[5]  There is a panoply of potential issues factoring into the ultimate question of reasonableness, because every patient treated at Mission received different services and was billed

reasonable with the determination of damages, and thus does not obviate the Court's required analysis of whether common issues of law or fact predominate over individual issues.

[4] Obviously, not every patient received an "average" bill.  The Court is reminded of Garrison Keillor's mythical Lake Wobegon, where "all the children are above average."  While the Court has not and need not undertake a further specific analysis, Plaintiff's logic leads to a conclusion that some class members may have been charged above and some below the "average" by which Plaintiff would seek to define "reasonableness," with the assumption that only those overcharged need receive compensation.  If the "average" here applies equally, the Court could reasonably conclude that some class members were actually underbilled.

[5] Plaintiff incorrectly relies on *Faulkenbury* for the proposition that differences in the amount of recovery is a collateral issue to the question of liability.  The *Faulkenbury* court allowed certification of a class of individuals based on the common question of an alleged violation of a constitutional right.  *Faulkenbury*, 345 N.C. at 697–98, 483 S.E.2d at 431–32.  It was for this reason the class was certified, and was why issues related to individual recovery were only collateral to the liability determination, not, as Plaintiff seems to argue, because individual issues of recovery are *always* collateral to a liability determination.

for different amounts. With 98,674 uninsured patients billed based on a Chargemaster containing more than 35,000 different rates, and variable approaches to discounting based on individualized circumstances, the number of potential combinations of charges is vast. Also, certain facts in the developed record suggest that it may not always be the case that charges billed to an insured patient are less than charges billed to an uninsured or self-pay patient who was afforded a discount, belying, at least in some cases, Plaintiff's assumption that Mission regularly and systematically imposes unreasonable charges on uninsured or self-pay patients that it would be unable to charge under the scrutiny of a carrier or other reimbursement agent.

{46}    Further, Plaintiff's proposed class definition does not account for the fact that there are significant variations among putative class members themselves as to how they may have been billed, negotiated discounts, paid their bill, or qualified for revised charges based on ultimate Medicaid eligibility.

{47}    To conclude, the Court finds that there are substantial factual issues individual to the proposed class members that would impact a liability determination as to an individual patient, such that determination of liability on a class-wide basis would be at least impractical, if not impossible. The same set of charges could be reasonable to one patient and unreasonable to another. Thus, liability to the class is only able to be established after extensive investigation into the individual billing circumstances of each patient. The Court therefore finds that common issues of law or fact do not predominate over individual issues of law and fact, and thus the commonality prerequisite to whether a class exists has not been met. For that reason, no class exists.

{48}    The Court's conclusion is consistent both with North Carolina appellate precedents and prior holdings of this Court.[6] While their decisions are not

---

[6] *See, e.g., Blitz v. Agean*, 2012 NCBC LEXIS 21 (N.C. Super. Ct. April 11, 2012) (denying class certification because individual questions regarding whether class members should properly be included in the class predominated over common questions of fact or law) *aff'd*, __ N.C. App. __, 743 S.E.2d 247 (2013); *Lee v. Coastal Agrobusiness, Inc.*, 2012 NCBC LEXIS 51 (N.C. Super. Ct. Sept. 27, 2012) (denying class certification due to plaintiff's failure to prove the existence of a class because

binding on this Court, other courts' determinations that similar changes to hospital billing practices do not qualify for class certification are consistent and persuasive. *See Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 525–26 (5th Cir. 2007); *Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 676–77 (S.D. Fla. 2007); *Eufaula Hosp. Corp. v. Lawrence*, 32 So.3d 30, 35–46 (Ala. 2009). At least two other similar cases brought by Plaintiff's counsel were not certified for the same reasons the Court outlines here. *See Hale v. Sharp Healthcare*, 2013 WL 3871436, at *3–4 (Cal. Super. Ct. 2013) (decertifying a class for failure to meet predominance requirement); *Terrazas v. Mem'l Health Servs.*, 2013 WL 3497701, at *3–4 (Cal. Super. Ct. 2013) (applying a similar analysis to determine putative class's failure to meet superiority requirement).

## V. CONCLUSION

{49} For the foregoing reasons, Plaintiff's Motion for Class Certification is DENIED. Because the Court's determination would be the same regardless of whether the Court used the definition originally proposed in Plaintiff's Class Action Complaint or the definition proposed in Plaintiff's Brief in Support of Plaintiff's Motion for Class Certification, Defendant's Motion to Strike Class Certification is denied as MOOT.

This the 8th day of December, 2014.

---

individual issues predominated over common issues, requiring a significant factual inquiry by the court).